1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NUTRAMAX LABORATORIES, INC. et al.,

              Plaintiffs,

    v.

CP William LLC,

              Defendant.

No.  2:24-cv-1586 WBS SCR

FINDINGS AND RECOMMENDATIONS

Pending before the Court is Plaintiffs' motion for default judgment and permanent injunction against Defendant CP William LLC.  ECF No. 13.  The motion was referred to the undersigned pursuant to E.D. Cal. R. 302(c)(19).  Hearing on the motion was set for September 19, 2024, but the Court took the motion under submission and vacated the hearing pursuant to E.D. Cal. R. 230(g).  ECF No. 19.  For the reasons set forth below, the undersigned recommends Plaintiff's motion be granted and the Court order permanent injunctive relief.

**I.**    **Background Facts and Procedural Posture**

Plaintiffs Nutramax Laboratories, Inc. and Nutramax Laboratories Veterinary Sciences, Inc. (collectively Nutramax or Plaintiffs) are headquartered and have their principal place of business in Lancaster, South Carolina.  ECF No. 1 at ¶¶ 3-4.  Plaintiffs research, develop, and sell animal health supplements and are the registered owners of the following marks:

    1.  U.S. Trademark Registration Number 2,231,260 (NUTRAMAX

1

LABORATORIES);

    2.  U.S. Trademark Registration Number 4,077,241 (NUTRAMAX

          LABORATORIES (Stylized);

    3.  U.S. Trademark Registration Number 4,654,181 (NUTRAMAX

          LABORATORIES VETERNARY SCIENCES, INC. (Stylized);

    4.  U.S. Trademark Registration Number 5,662,197 (COSEQUIN);

    5.  U.S. Trademark Registration Number 1,791,253 (COSEQUIN); and

    6.  U.S. Trademark Registration Number 3,481,550 (PROVIABLE).

*Id.* at ¶¶ 13, 23 (collectively Nutramax Marks).

       Each Nutramax product bears the Nutramax Laboratories mark in addition to a mark distinguishing the product's specific line, such as Cosequin or Proviable.  *Id.* at ¶ 16.  Nutramax Cosequin® supplements, which bear both the Nutramax Laboratories and Cosequin marks, and Nutramax Proviable® supplements, which bear both the Nutramax Laboratories and Proviable marks, are popular digestive animal health products that have generated significant sales nationwide.  *Id.* ¶¶ 16-18.

       Nutramax distributes its products through multiple trade channels, including "pure play e-commerce"—a trade channel where resellers only have an online sales outlet.  *Id.* at ¶ 28.  In the "pure play e-commerce" channel, as with other trade channels, Nutramax's products are distributed through a network of authorized sellers, in which substantially all resellers enter into Authorized Reseller Agreements (ARAs) with Nutramax. *Id.* ¶ 29-31.  To ensure a high level of product and customer service, the ARAs generally include two relevant provisions.  Id. at ¶ 32. First, "[t]he reseller is required to maintain qualified personnel with knowledge of the specification, features, and uses of Nutramax products and provide quality post-sale support to consumers." *Id.*  Second, "[t]he reseller is required to store Nutramax products in a cool, dry area out of direct sunlight in a controlled room with a temperature between 40 and 70 degrees Fahrenheit." *Id.*  Unauthorized resellers are not party to ARAs and therefore are not contractually bound by these staffing and storage requirements.  *Id.* ¶¶ 34, 36.

       Defendant CP William LLC is a "pure play e-commerce" seller engaging in the

1    unauthorized sale of Nutramax's Cosequin® Joint Health Supplements and Proviable®

2    Disgestive Health Supplements through Amazon.com under the seller account name "CP William

3    LLC."  *Id.* at ¶¶ 5, 38.[1]  "Defendants used the Nutramax Marks in conjunction with this

4    unauthorized sales activity," *id.* at ¶ 39, and "the Nutramax products sold by Defendants did not

5    conform to the requirements of the [ARAs]."  *Id.* at ¶ 42.  "Defendants obtained the Nutramax

6    products that they sold from one or more of Nutramax's authorized resellers and/or distributors."

7    *Id.* at ¶ 46.  ARAs specify which entities Nutramax products can be sold to and Nutramax has not

8    permitted an authorized reseller or distributor to sell its products to Defendants.  *Id.* at ¶ 47.

9    "Nutramax has never authorized Defendants to use the Nutramax Marks or sell Nutramax

10   products."  *Id.* at ¶ 51.

11        Plaintiffs commenced this action on June 3, 2024.  ECF No. 1.  Before filing suit,

12   Plaintiffs attempted to notify former Defendant Christopher William Powell of his unauthorized

13   sale of Nutramax products through mail correspondence and the seller messaging platform on

14   Amazon.com.  *Id.* at ¶ 49.  Defendant Powell did not respond and continued to engage in the

15   unauthorized sale of Nutramax products.  *Id.* at ¶¶ 49, 50.

16        Plaintiffs allege that Defendant Nutramax's actions constitute (1) trademark infringement

17   in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) unfair competition and

18   false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

19   and (3) tortious interference with a contract under California common law.  *Id.* at ¶ 2.  Defendant

20   was served but failed to respond, after which the clerk entered default.  ECF Nos. 10-12.

21   Plaintiffs moved for default judgment on July 29, 2024, seeking a permanent injunction and other

22   relief.  ECF No. 13-1 at 26-27.  Defendant has not appeared in the matter to respond or defend

23   against these claims.  *See generally* Civil Docket for No. 2:24-cv-1586 WBS SCR.

24   ////

25   ////

26

27   [1]  Plaintiffs originally sued both CP William LLC and Christopher William Powell.  Defendant
     Powell was voluntarily dismissed from the case on September 3, 2024.  ECF No. 18.  The
28   Complaint's reference to the plural "Defendants" was accurate at the time the Complaint was
     filed.

3

1    II.    **Legal Standards**

2    Default may be entered against a party against whom a judgment for affirmative relief is

3    sought who fails to plead or otherwise defend against the action.  *See* Fed. R. Civ. P. 55(a).

4    However, "[a] defendant's default does not automatically entitle the plaintiff to a court-ordered

5    judgment."  *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F.Supp.2d 1172, 1174 (C.D. Cal. 2002) (citing

6    *Draper v. Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986)).  Rather, the decision to grant or deny a

7    request for default judgment lies within the district court's sound discretion.  *See NewGen, LLC v.*

8    *Safe Cig, LLC*, 840 F.3d 660, 616 (9th Cir. 2016).

9    In making this determination, a court considers the following seven *Eitel* factors: (1) the

10   possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the

11   sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a

12   dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7)

13   the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the

14   merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

15   Generally, once default is entered, well-pleaded factual allegations in the operative

16   complaint are taken as true, except for those allegations relating to damages.  *NewGen*, 840 F.3d

17   at 617 (citing *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam)).

18   However, "necessary facts not contained in the pleadings, and claims which are legally

19   insufficient, are not established by default."  *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261,

20   1267 (9th Cir. 1992) (citation omitted); *see also DIRECTV, Inc. v. Huynh*, 503 F.3d 847, 854 (9th

21   Cir. 2007) ("a defendant is not held to admit facts that are not well-pleaded or to admit

22   conclusions of law") (citation and quotation marks omitted).

23   III.    **Analysis/Discussion**

24   A.  **Jurisdiction**

25   "[A] district court has an affirmative duty to look into its jurisdiction over both the subject

26   matter and the parties" before entering default.  *In Re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).  In

27   the present case, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

28   § 1331 because it arises under federal trademark law, 15 U.S.C. §§ 1051, et set.  The Court has

4

personal jurisdiction over Defendant because it is alleged that it is incorporated under the laws of California with its registered address in Sacramento, California, ECF No. 1 at ¶ 5; ECF No. 13-1 at 11, and because Defendant was served with process in this case, ECF No. 10.

### B. *Eitel* Factors

#### 1. *Eitel* Factor One: Possibility of Prejudice to Plaintiffs

The first factor "considers whether a plaintiff will suffer prejudice if default judgment is not entered." *See PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). Here, Plaintiffs would suffer prejudice if the Court did not enter default judgment. Despite Plaintiffs attempts to notify Defendant of its unauthorized sale of Nutramax products, Defendant continued to engage in the unauthorized sale of Plaintiffs' products. ECF NO. 1 at ¶ 50. Absent some recourse, Defendant is likely to continue infringing the Nutramax Marks. This factor favors default judgment.

#### 2. *Eitel* Factors Two and Three: Merits of Plaintiffs' Substantive Claims and Sufficiency of the Complaint

"The second and third *Eitel* factors both examine the merits and sufficiency of a plaintiff's complaint, and accordingly, are often analyzed together." *Johnson v. Qolor, LLC*, No. 21-cv-8475 RS, 2022 WL 3348589, at *1 (N.D. Cal. Aug. 12, 2022) (internal quotation marks and citations omitted); *see also Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1055 (E.D. Cal. 2010).

##### a) The Lanham Act Claims

As noted above, Plaintiffs bring claims of trademark infringement and of unfair competition and false designation of origin in violation of Sections 32(1) and 43(a) of the Lanham Act, respectively. 15 U.S.C. §§ 1114(1), 1125(a). Because the analysis "under the two provisions is oftentimes identical," the Court will evaluate them together.[2] *Brookfield Commc'ns, Inc. v.*

---

[2] The "ultimate test" for false designation of origin under § 1125(a), as a type of unfair competition claim, is similar to infringement claims under § 1114: the public's likelihood of confusion. *See Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008) (using the same likelihood of confusion test to analyze trademark infringement and false designation of origin claims); *GS Holistic, LLC v. Shinwar*, No. 2:23-cv-0355 CSK, 2024 WL 3890082 (E.D. Cal. Aug. 20, 2024) (noting that analysis of both types of claims turns on likelihood of confusion).

1  *West Coast Ent. Corp.*, 174 F.3d 1036, 1046 n.8 (9th Cir. 1999).  To prevail on a claim for relief

2  under either Lanham Act claim, Plaintiffs must prove that (1) "it has a protectible ownership

3  interest in the mark," (2) the Defendant used the mark, and (3) the Defendant's use of the mark

4  "is likely to cause consumer confusion."  *Dep't of Parks & Recreation for Cal. v. Bazaar Del*

5  *Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (citation omitted).

6  **i.  Plaintiffs' Ownership**

7  Federal registration of a trademark "provides 'prima facie evidence' of the mark's validity

8  and entitles the plaintiff to a 'strong presumption' that the mark is a protectable mark."

9  *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 14 (9th Cir. 2010) (quoting 15

10  U.S.C. §§ 1057, 1115(a)).  Because the Nutramax Marks are registered with the U.S. Patent and

11  Trademark Office, ECF No. 1 at ¶ 23, Plaintiffs have demonstrated prima facie ownership of the

12  infringed trademarks.

13  **ii.  Defendant Used the Marks**

14  Defendant was selling, through its Amazon.com account, several products with the

15  Nutramax Marks. ECF No. 1 at ¶ 38; ECF No. 1-3, Exhibit C.

16  **iii.  Likelihood of Confusion**

17  Generally, a trademark owner's right under the Lanham Act to control distribution of its

18  own products is limited by the first sale doctrine.  *See Sebastian International, Inc. v. Longs*

19  *Drugs Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995) (per curiam).  "Under the [first sale]

20  doctrine, resale by the first purchaser of the original article under the producer's trademark is

21  neither trademark infringement nor unfair competition."  *Enesco Corp. v. Price/Costco Inc.*, 146

22  F.3d 1083, 1085 (9th Cir. 1998) (citation omitted).  Because "trademark law is designed to

23  prevent sellers from *confusing or deceiving* consumers about the origin or make of a product,"

24  such "*confusion* ordinarily does not exist when a genuine article bearing a true mark is sold." *Id.*

25  (emphasis added).  However, after the first sale, the trademark holder may establish infringement

26  "if he demonstrates that the goods are materially different."  *Grateful Palate, Inc. v. Joshua Tree*

27  *Imports, LLC*, 220 F. App'x 635, 637 (9th Cir. 2007) (citing *Enesco*, 146 F.3d at 1087).  If the

28  product is materially different, the product is not genuine and may cause confusion regarding the

6

1   product's source, quality, or sponsorship.  *See Enesco*, 146 F.3d at 1087.

2          One way in which goods can be materially different is when they do not meet the

3   trademark holder's quality control standards, which "may result in the devaluation of the mark by

4   tarnishing the image."  *Id.* at 1087 (quoting *Warner-Lambert Co. v. Northside Dev. Corp.*, 86

5   F.3d 3, 6 (2d Cir. 1996)).  "If this occurs, 'the nonconforming product is deemed for Lanham Act

6   purposes not to be the genuine product of the holder, and its distribution constitutes trademark

7   infringement."  *Id.*  To qualify for the quality control exception, there must be "some defect (or

8   potential defect) in the product itself that the customer would not be readily able to detect."  *Id.*

9          Plaintiff alleges that an unauthorized reseller like Defendant is not contractually obligated

10  to store Plaintiffs' products at conditions required under the ARAs—in a cool, dry area out of

11  direct sunlight in a controlled room with a temperature of 40 to 70 degrees—which are designed

12  to maintain the quality of animal digestive supplements.  ECF No. 1 at ¶¶ 32, 34, 35; ECF No. 13-

13  1 at 17.  Without such quality control, the Nutramax products sold by Defendants may have some

14  defect or the potential defect that customers would not be readily able to detect, and a consumer

15  would thereby be confused or deceived.  *See, e.g., Enesco*, 146 F.3d at 1087 ("The oil, shoes, and

16  beer from *Shell*, *El Greco*, and *Coors* all contained or could potentially contain a latent product

17  defect due to the unauthorized distributor's failure to observe the manufacturer and mark owner's

18  rigorous quality control standards. Most importantly, a consumer would not necessarily be aware

19  of the defective condition of the product and would thereby be confused or deceived.") (quoting

20  *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 591 (5th Cir. 1993));

21  *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 n.4 (11th Cir. 2001) ("[T]he lack

22  of quality control can rise to the level of a material difference from the trademark owner's

23  products and create a likelihood of confusion.").[3]

24  _____

25  [3]  Plaintiffs also allege and argue that Nutramax products sold by unauthorized sellers like
    Defendant are materially different because unauthorized sellers are not subject to the requirement
26  of the ARAs to "employ qualified personnel with knowledge of the specifications, features, and
    uses of Nutramax products, which ensures that purchasers of Nutramax's products can access
27  product support directly from the retailer from whom they purchase."  ECF No. 13-1 at 17; *see*
    ECF No. 1 at ¶¶ 36, 37.  Because the material difference based on quality control is sufficient to
28  find a likelihood of confusion, the Court need not address the issue of material difference based

### b)  Tortious Interference with a Contract

Under California law, the elements of tortious interference with contractual relations are: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1105 (9th Cir. 2007) (quoting *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998)).

Plaintiffs have plausibly alleged each element.  First, Plaintiffs allege that they contracted with third-party authorized reseller, using ARAs.  ECF No. 1 at ¶ 31.  Second, Plaintiffs alleged that Defendant knew of the ARAs because Plaintiffs notified Defendant that its sale of Nutramax products was unauthorized on several occasions.  *Id.* at ¶ 49; *see Sebastian Int'l, Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1205 (C.D. Cal. 2001) (letters a plaintiff sent to the defendants informing them that their sales were unauthorized is evidence of defendant's knowledge that their conduct interfered with a plaintiff's third-party contracts).  Third, Plaintiffs have plausibly alleged that Defendant acted intentionally because Plaintiffs notified Defendant of his unauthorized sale of Plaintiffs' products, and Defendant continued to sell the marked products.  ECF No. 1 at ¶ 49, 50.  From this, it can be reasonably inferred that Defendant is aware that a breach or disruption of the ARAs necessarily results from his conduct.  *See Quelimane*, 19 Cal. 4th at 56 (intent can be establish by evidence showing the defendant knew that the contractual interference or breach was a "necessary consequence of his action," even if not the primary purpose).  Fourth, Plaintiffs alleged that Defendant's conduct resulted in "one or more of Nutramax's authorized resellers and/or distributors [breaching] their agreement with Nutramax by offering to buy and/or buying Nutramax products from one or more of them—none of whom are authorized to sell Nutramax products to Defendants for resale," and "caused those parties to divert their authorized Nutramax products to unauthorized purchasers in breach of their agreements with Nutramax."  ECF No. 1 at ¶¶ 71, 72.  Finally, Plaintiffs claim Defendant's conduct has resulted in damage to Plaintiffs

---

on customer support.

1  because Plaintiffs have been unable to control the distribution and quality of its products, harming

2  the substantial goodwill that Nutramax has accrued.  *Id.* ¶¶ 32, 34, 35, 44.

3  ### c)  Conclusion on *Eitel* Factors Two and Three

4  Because Plaintiffs have adequately alleged and supported each element of its three claims,

5  *Eitel* factors two and three weigh in favor of default judgment.

6  ### 3.  *Eitel* Factor Four: Sum of Money at Stake

7  Because Plaintiffs do not seek monetary damages and only seek injunctive relief, ECF No.

8  13-1 at 22-27, the fourth *Eitel* factor categorically weighs in favor of granting default.  *PepsiCo*,

9  238 F. Supp. 2d at 1176-77 (fourth *Eitel* factor favors granting default when the only relief sought

10  is injunctive relief); *SevenFriday AG v. Ancon Watches Inc.*, No. 14-cv-8612 GHK FFMx, 2016

11  WL 6246362, at *2 (C.D. Cal. Jan. 4, 2016) (same).

12  ### 4.  *Eitel* Factor Five: Possibility of Dispute Concerning Material Facts

13  Plaintiffs made well pleaded factual allegations, ECF No. 1, which after default the Court

14  takes as true, and served Defendant, ECF No. 10, and Defendant failed to defend the action.

15  Under these circumstances, "there is little possible dispute of material fact that would preclude

16  the grant of default judgment."  *Stokes v. Amen Corp.*, 2024 WL 1461955, at *4 (E.D. Cal. Apr.

17  4, 2024).  Accordingly, the fifth *Eitel* factor weighs in favor of default judgment.

18  ### 5.  *Eitel* Factor Six: Whether Default is Due to Excusable Neglect

19  Because Defendant has been properly served with the summons and complaint, the notice

20  of entry of default, and the motion for default judgment and the supporting documents, ECF Nos.

21  10, 11, 13, and has failed to respond, the sixth *Eitel* factor weighs in favor of default judgment.

22  *See Stokes*, 2024 WL 1461955 at *4.

23  ### 6.  *Eitel* Factor Seven: Policy Favoring Decisions on the Merits

24  The seventh factor reiterates the general rule disfavoring default judgment.  *Id.*  Because

25  Defendant has refused to participate in this action, rendering it impossible for this Court to issue a

26  decision on the merits, the seventh *Eitel* factor weighs in favor of default judgment.  *See Id.*

27  ### 7.  *Eitel Factor Balancing*

28  The undersigned finds that all *Eitel* factors support default judgment against Defendant.

9

**C. Relief Sought**

As noted above, Plaintiffs do not seek monetary damages, only injunctive relief. ECF No. 13-1 at 22-27. The Lanham Act bestows upon the Court "power to grant injunctions according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of [the trademark registrant]." 15 U.S.C. 1116(a); *see also Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1137 (9th Cir. 2006).

**1. Permanent Injunction**

A party seeking a permanent injunction must demonstrate: "(1) that it has suffered irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that considering the balance of the hardships between plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1005 (9th Cir. 2023) (applying the *eBay* factors in trademark infringement case). Plaintiffs satisfy all four requirements.

First, under the Lanham Act, irreparable harm is presumed when a court has determined that there has been a violation under the Act. *Id.* (citing 15 U.S.C. § 1116(a)). Because this Court has made such determination, and Defendant has not rebutted Plaintiffs' allegations under the Lanham Act, the Court presumes irreparable harm to Plaintiffs.

Second, because in trademark cases "there is no adequate remedy at law for injury caused by a defendant's continuing infringement," the remedy of choice is injunctive relief. *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175 (9th Cir. 1988). Here, Plaintiffs do not seek monetary damages because they argue damage to their reputation, an intangible injury, is difficult to assess. ECF No. 13-1 at 25. The Court agrees that monetary damages would not make Plaintiffs whole where Defendant's action has put Plaintiffs' product quality and reputation at risk and Defendant continued to infringe on Plaintiffs products despite being notified of its unauthorized sales.

Third, because the only potential harm to Defendant is "financial hardship from ceasing infringing activities," such harm does not outweigh the irreparable harm of injury to Plaintiffs if

10

Defendant's conduct is not enjoined. *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017); *see also Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997) ("where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration") (quotation marks and alternations omitted).

And fourth, the public interest would be served because "the public has an interest in the enforcement of federal statutes." *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008); *see also Fashioncraft-Excello, LLC v. BG Wholesale Inc.*, 2024 WL 648680, at *5 (C.D. Cal. Jan. 4. 2024) ("the public interest would be served by enter of a permanent injunction because it has the right of the public not to be deceived or confused") (citations and quotation marks omitted).

Accordingly, the undersigned finds that Plaintiffs are entitled to a permanent injunction.

## 2.  Scope of Injunction

Injunctive relief should be "tailored to eliminate only the specific harm alleged," *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1297 (9th Cir. 1992), and be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiff," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Plaintiffs have brought similar, if not identical, claims against other defendants in a variety of federal courts.  In those cases, the courts have similarly granted permanent injunctions. *See Nutramax Laboratories, Inc. v. JT Best Deals, LLC*, No. 2:23-cv-1885, 2024 WL 2325198 (W.D. Wash. May 22, 2024); *Nutramax Laboratories, Inc. v. Cyberzenn, LLC*, No. 2:23-cv-1883 CDS DJA, 2024 WL 2093370 (D. Nev. May 22, 2024); *Nutramax Laboratories, Inc. v. Ninja Trading Inc.*, No. 1:24-cv-1283, ECF No. 21 (N.D. Ill. July 18, 2024); *Nutramax Laboratories, Inc. v. Tovar*, No. 5:23-cv-2366 MRA SP, 2024 WL 32221731 (C.D. Cal. May 23, 2024).  However, two courts limited the scope of injunctive relief sought. *See Nutramax Laboratories, Inc. et al. v. Tovar*, 2024 WL 32221731 at *9-10 (granting permanent injunction but declining to enjoin Defendant and his privy from "otherwise competing unfairly with Nutramax in any manner[,]" and other third party "online retailers, social media platforms, internet search engines, and email service providers" who receive actual notice but are not in privity with Defendant); *Nutramax Laboratories, Inc. v. Ninja Trading Inc.*, No. 1:24-cv-

1   1283, ECF No. 21 at 4-5 (same).

2        For the reasons provided in *Nutramax Laboratories, Inc. et al. v. Tovar*, 2024 WL

3   32221731 at *7-9, the undersigned also recommends that the injunction here *exclude* the

4   following language proposed by Plaintiffs: "otherwise competing unfairly with Nutramax in any

5   manner" and "those with actual notice of this Order—including any online retailer, social media

6   platforms, internet search engines, and email services providers."  *See* ECF No. 1 at 14-15; ECF

7   No. 13-1 at 27; ECF No 13-2 at 5.  As to the first phrase, enjoining "any" other hypothetical

8   "unfair[]" competition with Nutramax "is overly broad and not specific to Plaintiffs' injur[ies]"

9   under the Lanham Act and for tortious interference with contract.  *Nutramax Laboratories, Inc. et*

10  *al. v. Tovar*, 2024 WL 32221731 at *8.  As for the second phrase, "a court may not issue

11  injunctive relief 'so broad as to make punishable the conduct' of any third party simply because it

12  was given actual notice of the injunction but is otherwise 'act[ing] independently and whose

13  rights have not been adjudged according to law.'"  *Id*. (quoting *Regal Knitwear Co. v. N.L.R.B.*,

14  324 U.S. 9, 14 (1945)).

15  **IV.    Conclusion**

16       Accordingly, it is RECOMMENDED that:

17       1.  Plaintiffs' Motion for Default Judgment and Permanent Injunction (ECF No. 13)

18            be GRANTED.

19       2.  The Court issue the following permanent injunctive relief:

20            a)  Defendant CP William LLC and his respective agents, servants,

21                 employees, and/or all persons acting in concert or participation with

22                 Defendant who have actual notice of this Order be enjoined and

23                 restrained from:

24                 i.  using Nutramax's trademarks (including, but not limited to,

25                      the NUTRAMAX LABORATORIES, CONSEQUIN, and

26                      PROVIABLE marks) or colorable imitations thereof in

27                      connection with the distribution, marketing, advertising, or

28                      sale of any Nutramax product that Nutramax has not

1                                                  authorized to be sold to or by Defendant;

2                ii.    passing off, inducing, or enabling others to sell or pass off

3                           any product as a genuine Nutramax product that has not

4                           been produced under the authorization, control, or

5                           supervision of Nutramax and approved by Nutramax for

6                           sale to or by Defendant; and

7                iii.   shipping, delivering, transferring, moving, storing,

8                           distributing, returning, or otherwise disposing of, in any

9                           manner, products or inventory not authorized by Nutramax

10                          to be sold to or by Defendant.

11            b)  Additionally, Defendant CP William LLC and his respective

12                agents, servants, and employees be required to:

13                i.    permanently remove all of Defendant's product listings for

14                         any Nutramax products (including, but not limited to,

15                         Consequin® or Proviable® products), and thereafter

16                         prohibit Defendant from ever relisting or offering for sale

17                         any Nutramax products;

18                ii.    permanently remove any and all advertisements used by or

19                         associated with Defendant in connection with the sale of any

20                         Nutramax products; and

21                iii.   deliver to Nutramax or destroy, at Nutramax's discretion, all

22                         Nutramax products in Defendant's possession or held on

23                         behalf of Defendant.

24      These findings and recommendations are submitted to the United States District Judge

25 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen days

26 after being served with these findings and recommendations, any party may file written

27 objections with the court and serve a copy on all parties.  *Id.*; *see also* Local Rule 304(b).  Such a

28 document should be captioned "Objections to Magistrate Judge's Findings and

Recommendations." Any response to the objections shall be filed with the court and served on all parties within fourteen days after service of the objections. Local Rule 304(d). Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

DATED: November 4, 2024

SEAN C. RIORDAN
UNITED STATES MAGISTRATE JUDGE

14